I would like to reserve one minute for rebuttal. I would like to concentrate this morning on the home visit issue, and that is whether the home visit in this case that involved a warrantless entry into Mr. Hedrick's home by two probation officers whose purpose was to inspect the interior of the home for violations of law is a search requiring reasonable suspicion. Mr. Hedrick was on post-prison supervision. He had completed his sentence. He had served the entire sentence less statutory good time. He was not in constructive custody. He had not been released early, and he still had an expectation of privacy in his home despite being on post-prison supervision. The conditions of post-prison supervision were set by an executive branch entity, the Oregon Department of Parole and Post-Prison Supervision. He was supervised by an agent of that executive branch agency, supervising officers, probation officers, what have you, and any violations of post-prison supervision are adjudicated by the same executive branch entity, the Oregon Department of Parole and Post-Prison Supervision. A judge is not involved whatsoever in either the setting of these conditions of post-prison supervision or in the adjudication of any violations. Why would that matter? I'm sorry, Your Honor? Why would that matter? It seems to matter to some who have written in this area that we're talking about government officials, we're talking about executive branch officers supervising this post-prison supervision as opposed to a probation officer, let's say, in the federal system who is in the judicial branch and is acting as a representative of the judge. I don't know that it does matter. It seems to matter to some, but it matters in the sense that we're talking about the officers who showed up at Mr. Hedrick's home being, what I would say, no different than law enforcement officers in what they were seeking to do and what they were trying to determine. Weren't they trying to determine what circumstances he was under, the circumstances under which he was living? The testimony at the hearing was they wanted to determine if he lived there, they wanted to see his lifestyle, and they wanted to see if there were any violations of law in plain view in the interior of the home, which is particularly that last purpose that puts it into the realm of a search, in our view. Well, wouldn't that be an inevitable, necessary consequence of the first two purposes? If they came into the home to talk to him and examine his living conditions, wouldn't they necessarily, while they were there, if they saw an offense in plain view, that was something they would take into account, that would have an effect? If they didn't mention that, it would just be ignoring something that's inevitable, wouldn't it? You could look at it like that. Just a little more honest, to add that. Well, sure, you could look at it like that, but I don't think it's any secret that when probation officers, supervising officers are seeking entry into the home, that's one of their highest priorities, to see if there's been recidivist behavior. And if there has, to sanction it. But that's part of the enforcement of the probation condition. And there seems to be Supreme Court law and law in this circuit that draws a line between enforcement of probation conditions and enforcement and other law enforcement activity. Well, if you're referring to the Knights decision. The Knights and Griffin and so on. Well, the thing about all those cases is that they all require reasonable suspicion, or at least they all said. That's not the question we're asking right now. We're asking whether supervision of parolees or supervised releasees is different for Fourth Amendment purposes than enforcement of statutes against people who are not under supervision. When you're enforcing the conditions of the supervised release and not something else. Well, when you're enforcing the conditions, there's two ways to enforce them. First, you can sanction the person for the violation within this administrative post-prison supervision system. Or you can take the fruits of what you learn by going into the home and looking around and turning it into a new criminal prosecution. Which is what happened in this case. That's the sort of entanglement with law enforcement that seems to be a factor under either the totality of the circumstances approach or the special needs approach. You know, in determining do you have to have reasonable suspicion before you're allowed to do this and what the purpose is. It seems there are three possible ways to analyze this. One is the totality of circumstances. Another is special needs. And the third is whether this is a search at all. I'm sorry, the last part, Judge. Whether this is a search at all. I would submit it's definitely a search because there's an entry into the home. And the cases Payton, Prescott of this Court clearly state when you enter the home, that's a search. You have a reasonable expectation of privacy in the home. It enables a government official to intrude upon the privacy of domestic life, view the intimate details of domestic life. So once you cross the threshold, once you physically enter, that's a search under any interpretation of the Fourth Amendment and under any case of this Court and the Supreme Court. How about this? A Fourth Amendment search does not occur even when the explicitly protected location of a house is concerned, unless the individual manifested a subjective expectation of privacy, et cetera. And, you know, society is willing to recognize it. That's the Supreme Court. And the case that. Tyler. Tyler. It says that Fourth Amendment search does not occur even when it's in the home. So in some circumstances, at least the Supreme Court thinks you can go into the home and it's not a search. Well, Kylo was using that infrared device to detect heat emanating from the house. I'm not talking about what is what the case. I know what the case was. I'm just talking about what the court wrote. And they said that a search does not occur even when explicitly protected location of a house is concerned, unless and then they say the individual manifests a subjective expectation of privacy and it's an expectation that society is willing to recognize. So there are some entries into a home that the Supreme Court has said do not constitute a Fourth Amendment search. Well, again, I would go back to the to the cases that. Well, I'd like to go back to the Ninth Circuit cases a lot of times. But once the Supreme Court says something, we can't do that. Well, and again, and I'm not exactly familiar with the with the exact quotation. I mean, I'm familiar with Kylo, but that that particular passage, you know, First of all, Kylo in the end decided that there was a search. But more than that, Kylo did not involve anybody walking inside a house. Right. That's the distinction I was trying to make. And again, nevertheless, we don't limit cases to the facts of the case. Well, sure. The Supreme Court sets forth the proposition, prepare to follow it. And there are principles. And the same thing could be said about Peyton versus New York, which, you know, again, wasn't the precise issue. It was a long time ago and a long and different era. Well, this is now the era of the Fourth Amendment in the 21st century, whatever that's worth. Well, I would like to think that until a case like Peyton or this court's decision, I think, which predated Peyton, a Prescott with which, again, focused on crossing the threshold as being the significant event that a government official walking into the home where he can look and observe the intimate details of the home, that's a search. Are you objecting to the conditions of probation? I don't know that we had standing to object to the conditions of probation. I would say this. I'm not sure that Mr. Hedricks was in any position to not consent to them. I think they were overbought, yes. I think he was required to allow a home visit, a physical entry into the home, and without reasonable suspicion. At least that's what the government seems to be, you know, saying in this case. And at the time he agreed to that, first of all, a lot of these cases weren't decided. At least the Knight's case wasn't decided. And I'm not sure that he can consent to an unconstitutional condition. So just like this Court recently wrote in the Antelope case where a defendant on supervised release had to agree to sex offender treatment where he had to admit past sexual offenses. Aren't you just asking whether you objected to it? And you do say that you think the condition is overbought or otherwise unconstitutional. I think so. If it allows physical entry into the home without reasonable suspicion, then it is an overbought, unconstitutional condition of his post-prison supervision. So, yes, I would object to it on that basis. Counsel, what are the alternatives if Mr. Hedrick had not agreed to the conditions? Well, if you look at, I believe, page 106 or 107 of the record, it says if you don't abide by the conditions, you go to prison and you potentially lose your statutory good time. Well, that's different from the question, I think. The question was if you don't agree with the conditions, what happens? I don't think we know the answer to that question. I can only relate to what the board of prison, of post-prison supervision, told him when he left prison, and that is these are the conditions. If you don't abide by them, you go back to prison or you lose your good time. How long was his sentence? His sentence, he received a probation revocation sentence, I'm going to say two years, and I will look while counsel is talking to you to answer that question exactly. Did he serve all of that or did he serve part of it? He served his entire sentence, less statutory good time. This is not a parole case where they cut his sentence down substantially and he's in constructive custody. He served his sentence, was released on his post-prison supervision, and I think the period of supervision was three years. His exact sentence, I'm going to say 18 months. So he has served his full sentence. He served his entire sentence, yes. He was not released early. Was the term of supervised release proposed at the end of the sentence? Yes. It's very similar to supervised release in the federal system. You serve your sentence and then you're on a period of supervision. But the difference, which perhaps is significant, perhaps not, is it is governed and adjudicated by executive branch officers and not judicial branch officers like we have in the federal system. I've asked to reserve some time for rebuttal and I see no time. Thank you. May it please the Court. Counsel, I'm Leslie Baker on behalf of the United States. The first issue here is whether a home visit condition imposed on someone who has been convicted is tantamount to a search and does it require some level of cause before the probation officers can enter into the home. As the Court is well aware, we have argued that it doesn't and the trial court found that it doesn't. That that is a... Why doesn't it? Because it was a condition? It doesn't... So, therefore, if the condition was that you are to subject yourself to a, your house to a complete search, meaning opening of a drawer, as a condition of supervised release, that would be okay, too, because you wouldn't have a reasonable expectation of privacy because he was only released on that condition. No, I don't think that's the case. In this case, there were two separate conditions.  I don't think I'm asking you if what's important. Why isn't it a search? Automatically, it's a search if somebody comes into your house under force of authority. Because the person has been placed under conditions of supervision because they have committed offenses for which they've been... Would it matter whether those conditions are constitutional or unconstitutional? Well, in this case, we're arguing that it is constitutional because a person... It's not just because it's a condition, but it's because it's a lawful constitutional condition. Exactly, because someone who has been convicted has a lesser expectation of privacy. The case is that... How much lesser? Lesser enough that if the condition were that they have to have a full house search whenever the probation department wants without reasonable suspicion, that would be okay, too? Well, in this case, there was reasonable suspicion element on the condition, and I don't know how far it would go, but... I'm trying to understand your theory as to why a home visit... Ordinarily, if somebody comes inside your... If a police officer or a government official under force of law and without consent comes into your house, it's a search. Is that right? Yes. Okay. You say this isn't because he doesn't have an expectation of privacy because he's on supervised release, and this is a condition of a supervised release. No, that he has a lesser expectation of privacy because he's on... How much lesser? Enough lesser that the probation officer can come in the door to see what kinds of conditions. How do we get that? We get that from the cases that talk about the societal interest that we have of a person that's been convicted and having someone supervise them, one, to try to help them become law-abiding and not reoffend, but at the same time to protect society because this group of people have a greater chance of recidivism. How far do they extend here? I guess, where's the line between a home visit and a condition as to which he would have a reasonable expectation of privacy? That's beyond, I think, where I'm prepared to commit today, because in this case, we had a legitimate entry into the home, and within 60 to 90 seconds, the officers see in plain view in the living room items that give them reasonable suspicion to go to the next step and conduct a search. Counsel, in this case, on the supervised release, the period of supervised release, so 36 months at the end, is not a condition of him getting out of prison because he's already served his sentence. So this is unlike probation where you say, look, you can either stay here in jail for another two years or we'll let you out as long as we come to your house. There you've got a situation where you've got consent, right? Correct. The alternative is if you don't want to consent, that's fine. We'll just keep you here in prison. Correct. Here, if you say, look, you're going to let us in your house, and he says, no, I don't want you to come into my house, they can't send him back to prison, can they, because he served his sentence. It's very similar to under the federal system, supervised release. The sentence that was imposed was less than what the statutory maximum was. I believe counsel is right. I believe he served 18 months on a negligent homicide case. So there is still some. A period of supervised release exceeds the time remaining on his sentence. Very much like supervised release in the federal system, even though the person. The federal system can be beyond the maximum sentence. Yes. Well, beyond a guideline range sentence up to the statutory maximum. So there was still some time available. In any event, the question is, if somebody is sentenced to supervised release. And he's asked to sign a statement that one of the conditions of the supervised release is X. And he says, no, I don't think I have to sign that. And the judge says, yes, you do. Can he be sent to jail for refusing to comply with a condition of supervised release? I expect it would depend upon the court and or the administrative body to make that determination. He didn't have to agree to anything. Isn't this an Oregon statute that says that he has to, that this is a condition of the home visits are a condition of his. It's the equivalent to the Oregon statute that sets out various permissible conditions of probation. The apparently the permissible. It's not required. Exactly. But the post-prison supervision embodies virtually all of the statutory probationary conditions. And as for the terms. Can the judge or the supervising entity, I don't know which, choose among these conditions? Or I had thought reading the briefs that the conditions were mandatory, or at least this condition was mandatory. Is that not right? That doesn't appear in the record. I presume that the decision-making authority could, just as the court and the federal system can select conditions. Although in the federal system, typically there are a group of standard conditions that are imposed upon a person in the federal system. And I would suggest that a home visit is standard in both the federal and state system. And that may well be the approach that the state took. Even if the court were to find that there was some kind of protection at the entryway to this offender's home, that there should be some standard. In this case, alternatively, and as the trial court found, he consented. The officers were there in the middle of the afternoon in plainclothes. They were not displaying weapons. And they said, can we come in? And he said yes and let them in. He could have said no and then gone to some kind of hearing, presumably, about what sanction there would have been, if any, for refusing to let the officers in. We don't know that. But certainly the parole officers, I would. But he would have been violating the condition of his supervised release if he said no. Yes, that there may have been some consequences to him saying no and declining entry at the time. Is that what we usually mean by voluntary consent? Well, there's no evidence that he didn't consent in this case. The only testimony consistent with both probation officers and also consistent in their report, which is attached to counsel's original motion, is that they said, can we come in? And the defendant said yes and stepped back and let them in. He knows he has to let them in. If he doesn't, he's going to go to a hearing and he knows what the result of the hearing is. He's going to go back to jail. Well, that would be tantamount to saying that, in this case, a person on supervision can never consent to the officers coming in because there is a mandatory condition. Well, as long as they are there, pursuant to their, I mean, if they're there for some other purpose. They have no idea that he's on supervised release and they're there because they heard that somebody's roaming the neighborhood and they wanted to come into the house. But that's not what they were there for, right? They were there pursuant to their responsibilities to check up on this guy on his supervised release. Correct, correct. That would be different than some officers coming and saying, somebody's on the loose and has just burglarized a house down the street. Do you mind if we look in your house and see whether he's hiding in a closet? Correct. And in this case, then, under the examples that you've given, the person who is on supervision would have a greater expectation of privacy than an ordinary citizen who opens the door to police officers who say, can we come in? No, I touched by what you're saying. Under those circumstances, the authority that the probation officers have would not be exercised and we could have consent. But in this instance, they were coming directly pursuant to that authority. They said they were. And he had every reason to understand that. It seems to me that you're on firm ground to go back to your search question, which is an interesting one. Because it has to be not only a search, but an unreasonable search. I'm sorry. It has to be not only a search, but an unreasonable search. Correct. Your basic position, as I understand it, is that that's what a probation officer or parole officer is supposed to do, is to check up on somebody and see where he lives, and I guess that that's at least one of the basic elements. But your opponent's position is they can't do that unless they have some particular individualized suspicion. Do you have a case you rely on? We've cited the Reyes case out of the Second Circuit, which specifically spoke about the need for probation officers or supervising officers to conduct home visits. But your understanding, just in terms of theory, and as I said before, there are at least three theories available here, no search, special needs, totality of circumstances. Is Reyes best read as a special needs case? I would say it's read as a no search case or a special needs case. But why? It talks about the special circumstances of probation supervision. Without that piece of it, without the role of the probation scheme and the, quote, special needs of it, one might very well come to a different conclusion. I will reverse myself, Your Honor, and say I do think it does fall under the special needs. That's what society is balancing with the placement of someone on some kind of supervision after they've committed an offense. It's designed both to assist the offender and also to protect society. I think as far back in this circuit, in the 19, I believe it was 1997 case that we cited, Lotta v. Fitzharris, the court also acknowledged. I think it was 1975. I believe it was 1975. No. Where the court talked about the need for supervising officers to know the offender very well and itemize a number of things that they can do toward doing that. Interviews, go to the job. And one of the things that's enumerated is a home visit. And in this case, we believe that that's what permitted the officers to come in the door. Once inside, there were items that they found that gave them reasonable suspicion to then take the next step and outline the search condition. I don't think that Lotta directly decided the issue. Excuse me? Did Lotta directly decide the issue in this case? No. No. It was not a direct decision. But there was a fair amount of discussion about the role of supervision and parole officers. Unless the court has any additional questions, that's all I have. Thank you. Yes. The probation, the supervising officers have an interest in learning where he lives. They knew where he lived when they showed up at his house and he came to the front door. They didn't have to go. Isn't this just a classic special needs situation? You have a relatively small intrusion. Yes, they're in his house, but they're acting like they seem to be, at least initially, going only places where a social guest in the house would go, at least at the beginning, before they developed a reasonable suspicion. They go into his bedroom. On the other hand, you have this hostess. No, no, no. Not to go into his bedroom. One of the first. I'm sorry. I shouldn't have interrupted. So initially, they were just in the living room. He's off cooking in the kitchen. If the fuller brushman came to the door, he presumably would get that far as well. There is a fuller brushman. So you have a fairly minimal intrusion, although a search in traditional terms. And you have a system as to which knowing where he lives and who he's living with and what he's doing there is central. So why isn't that the answer? I don't know that there's – when you're talking about the home, I'm not sure that the term minimal intrusion is appropriate. I mean, you're going – you don't have to, once you're into the home, start opening up drawers and looking in closets to violate someone's sense of privacy and security. Just the act of walking in the threshold and seeing what's going on in the house. He's off to cook, like he would have done. You know, he wasn't – his people were in the house. It happened he had some stuff showing, and that's why he went further. But if not, that would have been the end of it. Well, yes, but it wasn't the end of it. And one of the first things the two supervising officers asked him when they actually got into the home was, where's your bedroom? Now, yes, they didn't walk into the bedroom, but that's one of the first things they did. What is more private? I mean, the fuller brush man usually doesn't get to look into the bedroom. He went into the bedroom just without – He didn't go inside. He didn't start looking through papers and closets, but he, you know, he looked in the bedroom, and he went to other areas. You know, saying that something is a visit seems – it's just a very polite way of saying, you know, we're intruding upon a person's expectation of privacy in the home. We're letting them – What about Wyman v. James, which is kind of an outlier case, and I'm not sure there's any other like it, but why isn't it pretty close to us? Judge, I'm sorry. That case is now ringing a bell. It's a welfare home visit case. Well, I think there's a difference. What the purpose behind the visit – They said it wasn't a search. Probably the only case like it. Yeah. It seems that these probation, parole search – and that's what this case is, in my view. And you mentioned the special needs. And the interesting – if we're going to go in that direction, the only case that the Supreme Court has decided in this realm of a probation and parole search is Griffin, and in that case, they used the special needs doctrine but affirmed the search because there was a Wisconsin regulation that said you had to have reasonable grounds. So they didn't dispense with – But I guess that's the question. The question is, is any – are searches indistinguishable for purposes of this doctrine, such that a full-fledged search, which is what you had in Griffin, requires reasonable suspicion, but something lesser than that might – and arguably more central to the purposes of the probation might require less than that. I would say under the special needs doctrine, since the only case that – and I guess, yes, I understand the Court's question. There is a difference in degree of intrusion between actually going inside the home, just going in and looking around and perhaps looking in papers and looking through closets and looking through drawers, although I would – I'm not sure I agree with that. I think preventing government officials from walking across the threshold and viewing the secrets of domestic life is what the Fourth Amendment was designed to prevent and to protect. But even under, you know, this minimally intrusive, it's just one of many factors that you consider if we're getting off now into this multi-factor totality of the circumstances. Well, you don't have to go into all those factors. If you stick with the basics of the Fourth Amendment, and this odd concept we've had for a long time, whether you have a reasonable expectation of privacy. So you may have a reasonable expectation today, and tomorrow when the Supreme Court says something, you no longer have a reasonable expectation of privacy because they say you don't have one. Well, here the question could be, you know, does a person on probation or parole or supervised release have a reasonable expectation that an officer will not come to his home for a home visit? Now, how do you answer that question? I'm not sure. How do you know what's a reasonable expectation? He might not have a reasonable expectation because he knows everybody signs these forms or that there's a statute. But it's got to be an expectation society's prepared to recognize. If society says we want to have home visits, then you no longer have a reasonable expectation of privacy because society doesn't recognize it. How you determine what society recognizes, it's, you know, maybe we have to go back to original intent. Well, I don't think you need a lot of complicated formulas for that question. Well, the answer to the question is yes, you do have a reasonable expectation of privacy. The Supreme Court has said that probationers and parolees had a diminished but not an extinguished expectation of privacy, and that would cover – How do you know whether this comes in within the diminished or not? Because I have not seen any case dealing with the home where a court has said – Well, Reyes, the second servant case. Well, Reyes, as I've argued in my brief, they were in the driveway where they had a right to be the probation officers. They looked into the backyard, saw a marijuana plant growing. At that point, they have reasonable suspicion. That may be how they could have analyzed it, but it wasn't how they did analyze it. Well, I would say it's dicta because he had reasonable suspicion. The probation officers had reasonable suspicion when they went into Reyes' home. So the case is different than Mr. Hedrick. They had – and if I can end with the key point, if the Court wants me to end now, they had no reasonable suspicion. He was in compliance with all the conditions of release. They knew he lived there. Why would they show up at his house? Yeah, they want to verify it. He was there. Pardon? He was supposed to live there. They didn't know he actually lived there. And when he answered the door, that question was answered. So, you know, again, there's degrees, and they did not have to go into the home to satisfy that probationary parole purpose to verify that he lived there. They knew he lived there. All right. Thank you very much. The case just argued will be submitted. The final case of the morning is Oregon-Columbia-Burton-Masons Joint Apprenticeship Training Committee v. Gordon.
judges: Reinhardt, Berzon, Bybee